# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1559
_____

Todd Jon Roehr

*Plaintiff - Appellant*

v.

Sun Life Assurance Company of Canada

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: September 22, 2021
Filed: December 27, 2021
_____

Before KELLY, ERICKSON, and GRASZ, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Following the termination of disability benefits under a long-term disability plan ("the Plan") governed by the Employee Retirement Income Security Act ("ERISA"), Dr. Todd Roehr initiated this action against plan administrator Sun Life Assurance Company of Canada ("Sun Life"). Sun Life terminated Roehr's long-term disability ("LTD") benefits as of January 27, 2017, on the ground that Roehr had failed to provide proof of a disability. Roehr seeks reinstatement of LTD

benefits under the Plan. The district court, concluding that substantial evidence supported Sun Life's decision to terminate benefits, granted Sun Life's motion for judgment on the record submitted by the parties. Having jurisdiction under 28 U.S.C. § 1291, we reverse and direct the district court to order the reinstatement of Roehr's LTD benefits.

## I.    BACKGROUND

Between 1994 and 2006, Roehr worked as a board-certified anesthesiologist in Davenport, Iowa. In 2004, Roehr began experiencing intermittent tremors in his hands and fingers. The tremors were of great concern to Roehr because he has a strong family history of Parkinson's disease. Both his father and uncle were afflicted by the condition.

Roehr initially received care and monitoring for his tremors from Dr. Jeffrey Walczyk, his primary care physician. He also consulted three separate neurologists: Dr. Robert Rodnitzky, Dr. Lynn Struck, and Dr. John Wright. Roehr initially saw Dr. Rodnitzky on March 6, 2006. Dr. Rodnitzky, a movement specialist and professor at the University of Iowa, had previously treated Roehr's father. In his July 2006 notes, Dr. Rodnitzky observed that Roehr suffered from intermittent tremors in both of his hands. Roehr reported to Dr. Rodnitzky that he had self-prescribed a drug used to treat Parkinson's disease called Sinemet and that Sinemet was somewhat effective in controlling his symptoms.

While Dr. Rodnitzky was unable to provide a diagnosis, he did rule out Parkinson's disease and informed Roehr that he thought the Sinemet prescription was ill-advised. Dr. Rodnitzky recommended that Roehr seek a second opinion, which led to Roehr being seen by Dr. Struck. Dr. Struck also documented that Roehr was suffering from intermittent tremors but she, too, did not believe Roehr was suffering from Parkinson's disease. Dr. Struck observed that it was possible Roehr's tremors had a psychogenic origin and recommended that Roehr submit to neuropsychological testing. She also advised Roehr against taking Sinemet and

prescribed Primidone as an alternative. Roehr reported poor success and side effects from Primidone, so he discontinued taking Primidone and self-prescribed Sinemet. Dr. Struck ordered a brain scan and bloodwork, which both returned normal. Finally, Roehr was seen by Dr. Wright who concluded that Roehr had "a tremor of unclear etiology." While Dr. Wright initially advised Roehr to stop taking Sinemet, he subsequently agreed it was effective against Roehr's symptoms and provided a prescription.

Roehr became concerned about the unpredictably of his tremors because an unanticipated tremor could expose his patients to a risk of paralysis, serious injury, or even death. As a result of his trepidation, in October 2006, Roehr stopped working as an anesthesiologist due to "Tremor, Bradykinesia (slow movement), Rigidity, Postural Instability, Decreased Fine Motor Control." Roehr applied for LTD benefits under the "own occupation" provision of the Plan underwritten by Sun Life. Under the terms of the Plan, Sun Life acts as both the Plan's administrator and insurer. Dr. Wright forwarded a report to Sun Life that unequivocally concluded Roehr suffered from a tremor and slowing of movement that prevented him from working.

Under the terms of the Plan, "[b]enefits are payable when Sun Life receives satisfactory Proof of Claim," which "must include evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic testing materials as appropriate for the disabling condition." On May 25, 2007, Sun Life approved Roehr's claim for LTD benefits in the amount of $10,000 per month. Once LTD monthly benefits have been approved, according to the Plan, they "will cease on the earliest of: [1] the date you are no longer Totally or Partially Disabled. [2] the date you die. [3] the end of your Maximum Benefit Period. [4] the date you do not provide . . . proof that you continue to be Totally or Partially Disabled as requested." The Plan also states, in relevant part: "No LTD benefit will be payable to you . . . during . . . any period you are no longer under the regular and continuing care of a Physician

providing appropriate treatment and regular examination and testing in accordance with your disabling condition."

By 2008, none of the neurologists Roehr had seen had been able to come to a specific diagnosis related to his tremors. Over the next 10 years, Roehr elected to continue his follow-up treatment with Dr. Walczyk. Sun Life never objected to this treatment decision, nor did it seek an independent examination or give direction as to what it perceived to be appropriate care. Dr. Walczyk provided medical updates whenever requested by Sun Life. Sun Life never claimed the medical updates were incomplete or improper in any manner.

Between 2008 and 2018, Roehr continued to receive LTD benefits even though Dr. Walczyk's records occasionally failed to note an observation of tremors. Usually, this occurred when Roehr was being seen for some other clearly identifiable medical issue. For example, no neurological issues were noted in the records when Roehr had rotator cuff surgery in 2010. Nor were tremors noted when Roehr was seen in the emergency room following a chain saw accident. Likewise, no note of tremors appears in medical records related to a pre-operative cardiac assessment, or during a visit to his primary care doctor for a cough in 2016. Further, there was no notation of tremors during a routine physical performed in 2017. Much has been made of a January 17, 2017, medical note by Dr. Walczyk that includes the following finding: "Neurological – alert, oriented, normal speech, no focal findings or movement disorder noted."

Notwithstanding these records highlighted by Sun Life, when Roehr's medical record is viewed in its entirety, the record reflects that Dr. Walczyk frequently documented that Roehr exhibited permanent intermittent hand tremors, which prevented fine manipulation and affected Roehr's ability to work as an anesthesiologist. At times, the tremors appeared to be mild, and Dr. Walczyk reported them to be "generally controlled with medication." In short, the tremors were intermittent—that is, they ebbed and flowed in severity. And they were generally well-controlled by medication.

Sun Life performed ongoing reviews into Roehr's continued eligibility for LTD benefits and approved payment of benefits for nearly 10 years. Then in November 2017, Sun Life retained Dr. Frisso Potts, an independent neurologist, to review Roehr's file. Dr. Potts reviewed Roehr's medical records and agreed with the previous neurologists that Roehr did not have Parkinson's disease. Dr. Potts, focusing on Dr. Walczyk's exam notes from January 17, 2017, and Dr. Struck's surmise that Roehr's condition might have a psychogenic etiology, opined that Roehr did apparently suffer from intermittent tremors but that his condition "may well have improved." After reaching this conclusion, Dr. Potts spoke to Dr. Walczyk to confirm his suspicions and, as a result of these conversations, determined "[t]he medical evidence does not . . . preclude [Roehr from] returning to his occupation" as an anesthesiologist.

Armed with Dr. Potts's report, Sun Life sent an initial termination letter dated December 14, 2017, to Roehr, informing him that Sun Life was terminating his LTD benefits because he no longer satisfied the definition of total or partial disability. Sun Life listed seven reasons for its decision: (1) the lack of a formal diagnosis; (2) two evaluations completed years ago in 2006 and 2009, which indicated Roehr's tremor was not an "impairment"; (3) a 2006 evaluation that suggested Roehr's tremor might be psychogenic; (4) Roehr's failure to follow-up on a recommended psychological examination between 2006 and 2009; (5) Roehr's failure to provide Sun Life with the results of genetic testing; (6) Dr. Walczyk's January 17, 2017 exam notes, which Sun Life concluded suggests Roehr's condition had improved; and (7) Dr. Potts's report opining that no limitations "would preclude the claimant's returning to his occupation." Without an independent medical examination, Sun Life concluded that as of January 27, 2017, Roehr was fit to return to his previous employment as an anesthesiologist. Sun Life requested that Roehr reimburse it for LTD benefits made during the period from January 27, 2017, through November 30, 2017, in the amount of $101,333.33.

Roehr initiated an internal appeal to Sun Life, asserting in a detailed letter that Sun Life erroneously terminated his benefits. While Roehr did not complete

neuropsychological testing or provide results from genetic tests, he provided updated medical records from February 2018 in which Dr. Walczyk documented continued tremors and noted that Roehr "seems to do extremely well as long as he takes his Sinemet and Azilect." During this internal appeal process, Sun Life assigned Roehr's file to a Senior Benefit Consultant, who had no prior involvement in Roehr's case, and also retained Dr. David Hoenig, a board-certified neurologist, to conduct an additional review of Roehr's medical records.

On August 15, 2018, Dr. Hoenig reported back to Sun Life. Dr. Hoenig agreed with each of the prior neurological evaluations that found Roehr did not suffer from Parkinson's disease. Consistent with the findings of other medical providers, Dr. Hoenig acknowledged that the record plainly established that Roehr had a "movement disorder" or tremor. Tellingly, Dr. Hoenig noted that "an assessment by a neurologist/movement disorder specialist would be medically necessary in order to ascertain whether there is any neurologically based functional impairment." This was no off-hand remark. At least ten times in his report, Dr. Hoenig noted that Dr. Walczyk's findings were not a substitute for "an evaluation by a neurologist/movement disorder specialist."

On September 7, 2018, Sun Life upheld its initial decision to terminate Roehr's LTD benefits, claiming: (1) a lack of proof that Roehr's condition was worsening or permanent; (2) the presence of tremors that seemed mild and controlled by medication; (3) complaints of a "movement disorder" by Roehr's that only seemed to surface after his benefits were terminated; (4) the possibility that Roehr could be faking or exaggerating tremors; (5) the timing of disability; and (6) Roehr's failure to see a neurologist since January 2008 and/or completion of evaluations recommended by his former neurologists. It is noteworthy that Roehr's proof of disability remained the same for nearly 10 years and was accepted by Sun Life as sufficient evidence of ongoing disability during this period. In its final termination letter, Sun Life did not point to any new evidence indicating Roehr's tremors, which had been consistently identified as intermittent, had substantially improved permitting him to return to work as an anesthesiologist. Rather, Sun Life recounted

issues and concerns over the nearly10-year period that it had paid benefits, without notice to Roehr of any issues or concerns it had.

Having exhausted Sun Life's internal appeals process, Roehr commenced this action in district court, seeking reinstatement of his LTD benefits. The district court determined there was substantial evidence in the joint administrative record to support Sun Life's decision to terminate Roehr's benefits and thus granted Sun Life's motion for judgment on the pleadings. The district court rejected Roehr's argument that deferential review of Sun Life's decision should be relaxed because Sun Life took steps to reduce potential bias that could develop by serving both as the claim administrator and claim decisionmaker. Roehr appeals.

## II.    ANALYSIS

"We review the district court's adjudication of [an ERISA] claim *de novo*, applying the same standard of review to the plan administrator's decision as the district court." Johnston v. Prudential Ins. Co. of Am., 916 F.3d 712, 714 (8th Cir. 2019) (quoting McClelland v. Life Ins. Co. of N. Am., 679 F.3d 755, 759 (8th Cir. 2012)). The plan administrator's determination is reviewed for abuse of discretion when the plan grants the administrator discretion in its decision-making. Id. A court may apply a less deferential abuse of discretion standard based on factors such as when a "conflict of interest exists because the plan administrator is both the decision-maker and the insurer," id., or where the district court finds that some "procedural irregularity" has affected the review process. McIntyre v. Reliance Standard Life Ins. Co., 972 F.3d 955, 959 (8th Cir. 2020).

The district court did not err by evaluating Roehr's claims under the well-known abuse of discretion standard. This Court has "consistently rejected the notion that the mere presence of a potential conflict of interest is sufficient to warrant a less deferential standard." Cooper v. Metro. Life Ins. Co., 862 F.3d 654, 660 (8th Cir. 2017). Rather, such a potential conflict must be "weighed as a factor" and "should prove less important (perhaps to the vanishing point) where the administrator has

taken active steps to reduce potential bias and to promote accuracy." Id. at 661 (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)). Here, Sun Life actively sought to reduce any potential conflict of interest or bias by consulting with two independent physicians, Drs. Potts and Hoenig, who reviewed Roehr's medical records. Dr. Potts also consulted with Roehr's treating physician, Dr. Walczyk, and weighed Dr. Walczyk's opinions before finalizing his report to Sun Life. And, once these additional reports were received, Sun Life assigned Roehr's internal appeal to an independent consultant with no prior involvement in the file. We are unpersuaded by Roehr's claim that a more relaxed standard of review should be applied in his case.

We next turn to Roehr's claim that Sun Life abused its discretion when it terminated his LTD benefits without new significant evidence. We will uphold the decision to deny benefits if it is reasonable. Johnson v. United of Omaha Life Ins. Co., 775 F.3d 983, 989 (8th Cir. 2014). "We measure reasonableness by whether substantial evidence exists to support the decision, meaning more than a scintilla but less than a preponderance." Id. (quoting Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 583 (8th Cir. 2008)). The term "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . even if a different, reasonable interpretation could have been made." Id. at 989 (quoting McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 924 (8th Cir. 2004)). While a plan administrator's history of paying benefits to a claimant does not prevent it from changing its mind, "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance" weighing against the termination of benefits. McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002).

Review in this case is complicated by three unique factors: First, the cause of Roehr's tremors is unexplained. Second, his primary care physician has observed temporary improvement in his condition—which is inherent in an "intermittent" tremor. Finally, Roehr has not completed the neuropsychological or other examinations suggested by at least one neurologist. These factors in combination

with the documents in the administrative record that Sun Life points to that it believes constitute new significant evidence—the report of Dr. Potts; the report of Dr. Hoenig; and the exam notes of Dr. Walczyk dated January 17, 2017—cast doubt on the reasonableness of Sun Life's decision. In particular, the record indicates Dr. Potts and Dr. Hoenig, Sun Life's retained experts, have questions about whether Roehr is disabled by his tremors. Dr. Hoenig plainly states that further medical evaluation is necessary, and Dr. Potts seems to suggest that this would be advisable as well. While it is true that Dr. Walczyk stated in his notes on January 17, 2017, that Roehr exhibited "no focal findings or movement disorder," this singular notation occurred after Dr. Walczyk documented Roehr's persistent, intermittent tremors for approximately 10 years. Indeed, the notation is something of a red herring. The definition of intermittent is "coming and going at intervals: not continuous." The Merriam-Webster Dictionary Online, https://www.merriam-webster.com/ dictionary/intermittent (last visited Dec. 13, 2021).

In short, Sun Life relied on virtually the same medical records for a decade and has pointed to no information available to it that altered in some significant way its previous decision to pay benefits. See McOsker, 279 F.3d at 589 (noting a plan administrator may change its mind to terminate benefits when "information available to an insurer alters in some significant way the previous payment of benefits"). Here, Sun Life accepted Roehr's records as proof of a qualifying disability and then later, without expressing any concerns to Roehr, used essentially the same records to find Roehr failed to establish an ongoing, qualifying disability. While Roehr bears the burden of proving entitlement to benefits, this Court has explained that a plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on "substantial evidence." Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan, 874 F.2d 496, 500 (8th Cir. 1989). This is especially true where the administrator has made no "attempt to reconcile" its previous conclusions with the new recommendations. See Norris v. Citibank, N.A. Disability Plan, 308 F.3d 880, 885 (8th Cir. 2002).

The Plan provides that Roehr's LTD benefits will cease when Roehr fails to provide proof of disability as requested by Sun Life, or when he is no longer disabled. Sun Life's failure to follow the suggestions of its own neurologists and obtain the recommended assessments of Roehr's disability constitutes an abuse of discretion. Sun Life did not request that Roehr complete an independent medical exam until after it finalized the benefits termination. Moreover, Dr. Walczyk's January 2017 notation is hardly a basis for finding no disability, especially when Roehr's tremors were consistently described throughout his records as intermittent and subsequent exam notes from February 2018 indicated the tremors were present.

In addition, Sun Life approved Roehr's treatments and physicians without objection for approximately 10 years and only found such treatment inappropriate upon its final termination of his benefits, leaving Roehr without any meaningful opportunity to respond or seek other treatment. Again, Sun Life's disapproval of, among other things, Roehr's failure to seek care from a neurologist since 2008, his self-prescribing of medication that at least one neurologist recommended against, and his refusal to complete certain testing constitutes nothing more than a sudden change of heart on essentially the same record after almost a decade—and with no notice to Roehr prior to his benefits' termination. Sun Life's about-face requires "relevant evidence" that a "reasonable mind might accept as adequate to support" its change in decision. Johnson, 775 F.3d at 989; see also Gunderson, 874 F.2d at 500. That evidence does not exist in this record.

## III.    CONCLUSION

We reverse the district court's grant of Sun Life's motion for judgment on the record. Because there is not substantial evidence in the joint administrative record to support Sun Life's termination decision, we remand to the district court with directions to order the reinstatement of benefits as of January 27, 2017.

_____